To the fourth case, the United States v. Kelly. Mr. Hillis. May it please the Court. Counsel. My name is Daniel Hillis. I'm with the Federal Public Defender's Office and I represent Mr. Kelly. Mr. Kelly has raised a Fourth Amendment challenge to gun and drug evidence recovered from his apartment. Although the government argues that Mr. Kelly has waived or forfeited his ability to challenge probable cause by not sufficiently raising the issue, the record shows that Mr. Kelly adequately raised the probable cause challenge through his motion to suppress, where he asserted a lack of probable cause to search the apartment and he asked the evidence be suppressed. Also, the transcript from the suppression hearing shows that defense counsel made numerous efforts to challenge probable cause and those efforts are reflected in the government's appendix, pages 43 through 59. We also identify them in pages 2 through 4 of our reply brief. Moreover, there's a post-hearing brief where the defense counsel again asked for physical evidence to be suppressed. I believe that just asking to suppress is enough to raise the specific issue about the adequacy of probable cause? No, Your Honor, but in totality, all those various efforts, especially the efforts that What's the clearest place where the defense counsel said there wasn't probable cause to issue this warrant? The initial suppression motion raises it, but the clearest efforts are in the suppression hearing testimony, where defense counsel asks specifically about the various efforts by law enforcement to investigate and to establish probable cause. I mean, your criticism of the district judge for failing to address this issue is pretty hard to swallow. I believe that the issue was sufficiently raised in those areas where I've identified and it's in my client's interest. I believe because that's the strongest argument for suppression as a wholesale effort to exclude the evidence. Those would be our bases, those would be our record support. Although it is not, and I concede this in our brief, the primary effort was not to challenge probable cause. It was rather about the scope of the warrant and things along those lines. I don't think that it can be said that there was no effort made to challenge probable cause, such that we can conclude that there was waiver of forfeiture here. If I'm the district judge looking at this record, what's the clearest signal to me that I have to decide whether there was probable cause for this warrant? The two things I identified, the best would be the transcript evidence or the transcript evidence. Not in any of the briefing? No, but in the briefs as well. What's the language in the briefs that puts me on alert that I need to decide this issue? Generally, in the conclusion paragraph of the suppression motion, it was a request to suppress all physical evidence, and I believe it was a reference to probable cause. I'm looking through my brief right now, Your Honor. There was language that was cited in the suppression motion. I'd be very interested to hear the exact language given the way this has been briefed. If I could identify that perhaps in my rebuttal time, Your Honor. If I may move forward to the additional points, the totality of the circumstances show that the facts didn't provide a substantial basis for a judge who issued the warrant to decide that a search of Mr. Kelly's apartment would uncover evidence of wrongdoing. The affidavit of the police officer referred to a 2008 drug offense. It also referred to a firearm, but there was no assertion that it was unlawful for there to be a firearm in the apartment. Moreover, it was observed three to four weeks before the arrest warrant. Guns are portable. There was no prohibition on the gun being in the apartment so far as anybody knew. There was a report from a concerned citizen about drug dealing. The concerned citizen, as we identified in United States v. Wilhelm, that exact language should cause some concern. It should raise suspicions when we see that sort of language.  or say what apartment the drug dealing was occurring in. There was a controlled buy by an informant, but it was a $20 sale in a car, and the informant never was in the apartment, never bought drugs there, never saw drugs there, and there's no evidence that drugs were being stored there. With respect to the controlled buy, that took place right after the informant called Mr. Kelly, right? Yes. And he was observed leaving that back door and going into his car and then went to make the delivery, right? Yes. Is it unreasonable to think that there would be probable cause there to figure, well, to search the residence and the car, figuring the drugs had to have been in one of those two places? I believe that there's much better inference about the drugs being in the car. Obviously, they're on the person, but in any event, as far as the apartment, there is no evidence that anybody ever saw him with drugs up there. The drugs could have always been stored in the vehicle. Well, they could have been. Yes. But why isn't there probable cause to search both? Because there's nothing affirmative to link the existence of any drug materials up in the apartment. At best, we'd have an officer's. Had to be one or the other, right? Yes. On his person or in the vehicle. Certainly stronger inferences about those two things as opposed to in the apartment. We have a very small quantity of drugs. There's nothing to suggest that the drugs were definitively kept in the apartment. The officer's experience on this matter, and we misidentified in the brief, I refer to it as a Seventh Circuit case. It's a Sixth Circuit case, United States v. Schultz. The officer's experience and where drugs might be found is not sufficient as an evidentiary nexus between the place that the officer wants to search and the evidence he hopes to find. Nor is there anything talismanic about an informant's experience in providing information to law enforcement, especially in a case like this where we have highly unspecific evidence from the confidential informant. All we know is that they provided information of some sort. We don't know what degree or how useful it was in those ten cases that the officer identified. I believe that's too unspecific to lend any credibility or reliability to that evidence. Also, we have an affidavit, Your Honor, and perhaps this goes a little bit to about why drugs might be one place versus another, where the records check of Mr. Kelly's vehicle showed that he lived at a different residence. So drug dealers are, as a matter of history with law enforcement, apt to store drugs in their residence. This was not his legal residence so far as the officer knew. The legal residence would have been on Fifth Street or Fifth Avenue, whatever it was in Rockford, not the Clifton Avenue address that the officer listed in the search warrant. The officer knew from that records check where this individual had his residence, at least by way of the vehicle check. Also, Yunkert versus Massey, the general experience of where individuals might keep their drugs, again, doesn't establish probable cause, and that's a Seventh Circuit case on that matter. As for the third point in our brief, the lack of probable cause to search the Clifton Avenue apartment shows that the police officer couldn't reasonably rely on the warrant and cannot then, with the government, turn to the good faith exception. Though the government relies on Orozco, that case turned on the defendant's gang affiliation in relation to his known residence, and that established sufficient probable cause to search. Here, we don't have those things. We have a different known legal residence, and we don't have an individual who's known to be or alleged to be in any sort of gang. So we don't have the gang affiliation. In combination, those two things were relied upon by Orozco to determine that there was probable cause to search that individual's apartment. Rather, this case is most like the Owens decision, a case from this circuit where it was determined that the affidavit was too lacking to establish probable cause. And in Owens, we had a bare bones affidavit. We had no statement by the individual about the amount of drugs that was kept in the apartment. We had no statement that there would be any drugs found in the apartment should there be a search pursuant to the affiance evidence, or testimony, rather. And that's essentially what we have here. We've got more verbiage, but we don't have any better facts. We don't have any direct observations of drugs being kept in a place. We have a very small quantity of drugs, which would suggest that this could be a one-off drug sale, that we wouldn't have a remaining quantity in another place, such as the apartment. Of course, the apartment isn't known to be the residence of this individual. He's been observed there, true enough. But the records check showed that he lived somewhere else. So we have many of the facts that are missing in the Owens affidavit that should be problematic here for the government to rely on. That sort of evidence, I think, flies in the face of what Owens held. The warrant did not satisfy the Fourth Amendment's particularity requirement, either. It authorized the search of the upper unit, but none existed. There was no upper unit. There was, instead, a split-level apartment. So the warrant was insufficient for the police to identify the premises with reasonable effort, and there was a reasonable probability that the wrong residence could, in fact, be searched. If they are both, in fact, split levels and were authorized in the search of an upper unit, that lends to the possibility that we could be in either unit, searching the wrong place. And the government's reliance on the Stefanik case, I think, can be easily distinguished, because in Stefanik, we have an instance where we have an office building. There are multiple suites. They're all entered through a common entrance, and there was really no likelihood that the wrong unit could be searched, given the nature of the layout there. And that's totally different than what we have here. When police stormed Mr. Kelly's apartment, also, this should have put them on notice that they were in the wrong place, because they passed by a first-floor kitchen, and that should have alerted them that they were in the wrong place, and they should have then suspended the search. They knew that they were not in an upper... They were actually in the right... They went through the right door, and it just wasn't what they expected. It was a common door that led both to the basement as well as up to Mr. Kelly's apartment, and so when they went through and realized that there was a kitchen there, I think it's reasonable to say that they knew that they were not in a situation as described in the affidavit with an upper and lower unit. A first-floor kitchen would not have been present if they were, in fact, going through a door that led only to an upper unit. There was then a problem that they were aware of. They should have suspended their search, gotten a second warrant. That would have been easily done. Wait a minute. Suspended the search. I think when you were briefed, it actually said that if they'd already handcuffed, that they could have called the judge and gotten the warrant right on the spot. Yes. I'm guessing so as to be suspending it while you make a phone call. What was the change in circumstance that would have happened if the judge said, yeah, go ahead? Well, they would have proceeded. Maybe you're counting on maybe the judge would not allow them to go ahead. We believe the warrant should never have been issued in the first place, but in any event, when they go up and they have the individual in handcuffs, there's no longer an exigent circumstance. No longer what? An exigent circumstance. Right. The prudent thing would have been to, under Rule 43, to have asked for a second warrant to search then the additional areas where there is more evidence that's still to come, still to be found on the first floor, their scales, et cetera, down in the basement. There's gun and drug evidence, and we think that it was through the exact terms of the warrant would have authorized them to search was just the upper unit, and, in fact, they're now recovering evidence from different places, and that exceeds the scope of the warrant is our argument. What do we do with the Supreme Court's guidance in Maryland against garrison, which presented a related issue, and the court reminded us all of, quote, the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants. They obviously can't get, it's not like on TV where you can call up the blueprints for every building in the world on a computer instantly, and you don't know what's behind that door. You don't, but that goes to what reasonable law enforcement efforts should be in a case like this. They could have gotten better intel on this, and we cited or we stated in our brief that they could have contacted individuals, they could have done more. The police didn't want to do that because they didn't want to tip off, which is their choice how much to investigate. They could do things without tipping people off by going through utility records, talk to a postal worker, anything like that that would suggest the nature of the building being instead of a split level, two unit building as opposed to an upper and a lower. So there are things that they could have done, Your Honor. I'm into my rebuttal time, but I'd just like briefly to state that so far as the search of the basement goes, since that exceeds the scope of the warrant, the warrant said upper unit, and then it specified about the particular, it said premises rather, but it specified about the particular upper unit, and it narrowed where they were supposed to be searching. Instead, the officers searched down in the basement, and the district court said there was no legitimate expectation of privacy, but certainly in the ductwork that's attached to the upper unit, an individual who has the privacy expectations in his apartment would have a privacy expectation of things that are attached to it, much like a chimney on a house is part of a house, the ductwork attached to the apartment is part of the apartment. If somebody throws something down there, as this individual did, it doesn't mean that he's abandoned it or that he has no expectation of privacy in the ductwork that may extend down into the basement, which is basically the ductwork like a sealed container. I reserve the balance of my time for rebuttal. Thank you, Mr. Hillis. Ms. Green. May it please the court. Kelly Greening on behalf of the United States. The district court properly concluded that this search warrant met the particularity requirement of the Fourth Amendment. Detective Jimenez took investigative steps to determine the precise location of the defendant's apartment, and then disclosed to the state court judge the information reasonably known to him at the time of the issuance of the search warrant. That information, in sum, indicated that the defendant resided at the upper apartment of 1522 Clifton Avenue. The mischaracterization of the apartment as upper instead of rear in the search warrant does not invalidate the search warrant here, where there was no risk that the detectives and the executing officers would search the wrong apartment. They were able to adequately locate, based on the search warrant, the search warrant affidavit and Detective Jimenez's personal knowledge based on his investigation, where that apartment was located. And in fact, they did search the defendant's apartment here. They went to, as Detective Jimenez had learned throughout his investigation, the rear exterior door of 1522 Clifton Avenue. They opened that door, and that door can be seen in a photograph in government appendix page 10. There was only one rear exterior door in that building. They opened that door and went up an interior flight of stairs, which can be seen on government appendix page 13. There was only one flight of interior stairs, and they took that flight leading to the one door at the top of those stairs. And that door was, in fact, to the defendant's apartment. Detective Jimenez had gathered this information throughout his investigation from several sources, including, number one, a Rockford Police Department police officer who had conducted a welfare check on a woman who was known to be living with the defendant. That police officer had reported to Detective Jimenez that she herself had gone to the rear exterior door of 1522 Clifton Avenue and spoken to that woman who was known to be living with the defendant at that door. In fact, she had seen that woman walk down the stairs, that interior staircase from the defendant's apartment. In addition, she relayed a report that she had received in this welfare check stating that a relative of the woman known to be living with the defendant had gone to that rear exterior door, and the defendant answered that door, waving a gun in his hand. In addition, Detective Jimenez spoke to the confidential informant who went to that rear exterior door and had a conversation with the defendant at that door. And the defendant said to him at that moment, I will not sell drugs from my apartment or something along those lines, and then instead gave him his phone number and said, call me and we'll set this up and do it at another location. And that is, in fact, what happened. Ms. Greening, if there was no risk of searching the wrong place, what about the front portion of the basement, which apparently was done on the authority of this warrant? Well, first and foremost, Your Honor, the evidence that was found in the basement was found in an area where the defendant did not have it. I know that, and I know that there's a very serious issue about whether he can complain about it, but suppose we were dealing with a civil suit by the residents of the front apartment. How would this have been authorized? If the defendant had had a reasonable expectation of privacy in the area that was searched, then it would be... Could you consider my question about a civil suit by the residents of the front apartment? Yes, Your Honor. It would be appropriate under the circumstances to look at the exigent circumstances that were facing the officers at that time. Detective Jimenez had a report that the defendant had a gun at that location and had waved it around and said something along the lines of, call the police, I'll shoot them when they show up to. Detective Jimenez saw a vent cover had been taken off the wall in the north bedroom and that a safe door was open. And he concluded reasonably, and it turns out correctly, that the defendant had thrown items, including that gun, down that vent. And it is dangerous when executing a search warrant to have a potentially loaded gun in an area where you don't know where that vent leads to or who has access to that area. Detective Jimenez knew where to go when this search was executed. He knew to take the team to that rear exterior door and up the interior stairs, and that is where he took them. And once inside, he saw the defendant, as well as the woman known to be living with him. The search and seizure that took place in this case are identical to the search and seizure that would have taken place had that warrant said the word rear instead of upper. There was no violation of the defendant's privacy or property interests. And the district court properly determined not only that the Fourth Amendment particularity requirement was satisfied, but in addition that the search itself was reasonable.  first and foremost, the defendant did waive or in the alternative forfeit this issue of probable cause. It was not raised as an independent claim warranting suppression at any point before the district court, and the district court had no opportunity to address the issue of probable cause. To answer Judge Hamilton's question to defense counsel, the government's brief points out the one place in the motion to suppress where the words probable cause appear, and the paragraph states, it's on page 15 of the government's brief, the paragraph states, in this case, the search warrant fails to describe the area searched with the requisite particularity. The warrant is explicitly limited to the upper apartment and no other portion of the residence. The probable cause statement comes directly after that. This is couched within a particularity argument. But assuming this court were to reach the issue of probable cause, there was ample probable cause here to support this search warrant. Detective Jimenez included three major groups of information in his search warrant affidavit. The first was evidence of drug-related activity. Here, Detective Jimenez included not just a report from a concerned citizen, although that did, in fact, happen. A concerned citizen called in February of 2012 and said that there was a report of someone living at this residence engaging in drug dealing on a daily basis. In addition, there was a controlled buy of crack cocaine from the defendant using a confidential informant who was reliable, who had provided information in the past that led to ten prior drug convictions. That controlled buy took place under surveillance by Rockford police officers. There was plenty here to establish that the defendant was engaging in drug dealing, and it is well established in this circuit that evidence of drug dealing is likely to be found in a home where the drug dealer is living because there's oftentimes no direct evidence linking a particular residence to criminal activity, and courts are entitled to make reasonable inferences based on the information known to them, including the nature of the crime and the nature of the evidence sought. Who did the defendant say something about? First of all, he had a surveillance camera, as I understand, at his door. There was a surveillance camera at the back door. That's correct. And who came to the door and sent them away? You can call the cops, shoot them too? That's correct, Your Honor. That was a relative of the woman who's known to be living with the defendant. She reported to Rockford police that she went to the door looking for her relative, the woman living with the defendant, and the defendant answered the door holding a gun and said something along the lines of, and it's quoted directly in the brief as well as the search warrant affidavit, I believe, go ahead and call the police, I'll shoot them too. Now, during the search or before the search, I don't know whether it's in the record or not, were the police aware of this surveillance camera when they went there? I believe the police were aware of the surveillance camera when they went there because it was in the report of the welfare check that was given from another officer in the Rockford Police Department to Detective Menace. I don't know what kind of an alert that would be when they showed up. I'm just sort of curious about that. I guess nobody really knows. He seemed to run when they barged in. What's on the record, Your Honor, is that as the officers knocked and announced on that rear exterior door, they heard nothing, they entered the door. They then knocked and announced on the interior door up that interior flight of stairs, and they heard, or Detective Menace heard rather, he testified in the suppression hearing, footsteps running up stairs on the other side of that door. He then opened the door and saw the defendant at the top of those stairs crossing from the north bedroom to the south bedroom. He then went up those stairs and secured the defendant, and at that moment he realized not that he was in the wrong apartment, but that the apartment had been mischaracterized as upper instead of rear. Thank you. Turning to the issue of the basement and the reasonable expectation of privacy, the defendant did not have a reasonable expectation of privacy in the front area of the basement where this evidence was found. The undisputed testimony that was stipulated at the suppression hearing of the landlord slash owner of 1522 Clifton Avenue establishes that. The front apartment's tenants had control and access to the front section of the basement. There was a door between the front and rear sections of the basement that was supposed to be locked. It was not at the time that the police officers engaged in the search, but just because the defendant may have had access to the front section of the basement does not mean that he was able to exclude other persons from that section of the basement. In fact, quite the opposite. The undisputed testimony shows that it was the front apartment's tenants who were able to exclude the defendant from that area. Thus, he had no standing to challenge the evidence that was found in the front section of the basement. If there are no further questions from the panel, the government requests that this court affirm the judgment of the district. Thank you, Ms. Green. Thank you, Mr. Hillis. Judge Hamilton, in response to your question, page two of the reply brief, we note that the suppression pleading raised the probable cause issue by stating, and I quote, nor was the issuing court presented with any evidence establishing probable cause to search the rear apartment. It continues on, nor the first floor of the building located at Clifton Avenue in Rockford, Illinois. That's all about whether they got the right place. I believe they're two different things. In context, because your whole point is the difference between rear and upper apartment, right? There's the nor there, Your Honor, so it's what we have to work with here. It's what you've got to work with, I understand. Thank you. And it's not the only place that it's mentioned. Probable cause is mentioned in other places. And as we say in the preceding sentence in that paragraph, it was not the focus of the efforts, the suppression effort, but nevertheless, we think it was a valid effort, and it is supported through the record citations that we provided. As far as the lack of standing, I believe that's incorrect, that certainly if an individual has a legitimate expectation of privacy, and again, we say the ductwork attached to the apartment, anything that is there, he would have an expectation of privacy in the contents of the duct. Would that be similar to if he had thrown it down a garbage chute as opposed to this duct? Would it still be a reasonable expectation, Mr. Hills? No, Your Honor, I don't think so, unless the garbage chute was a self-contained item. Well, let's say it goes to the basement into a receptacle, eventually, weekly, to be removed. Much different between the shaft versus the garbage chute? Consider that the ductwork was a closed item that the officers, through the record, show that they had to open in order to access. We have a very different situation than a garbage chute or a laundry hamper that comes down as open and freely accessible to anyone. We have something that is very different in its content here, that it's closed. So I think there's a distinction there. The warrant author would have authorized the opening of any closed containers that could have contained contraband in the apartment, right? Right. The warrant, though, is limited, Your Honor, to the premises, which is then specifically stated to be the upper unit. So that's the problem, I believe. Unless the Court has other questions of me, we ask that the district court decision be reversed and that the items be suppressed. Thanks, Mr. Ellis. Thank you. As always, thanks to your office for fine representation. Thanks to the government and the cases taken under advisement. Court will proceed to the fifth case.